IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**DAKARAI HASANAI NETTER**                                                         **PLAINTIFF**

v.                                                                    CIVIL ACTION NO.  1:14-cv-375-JCG

**CAROLYN W. COLVIN,**
**Commissioner of Social Security**                                                **DEFENDANT**

**MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

This matter is before the Court on Plaintiff Dakarai Hasanai Netter's Motion for Judgment on the Pleadings [14].  Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the administrative decision by the Commissioner of Social Security denying his claim for disability insurance benefits and supplemental security income.  The Commissioner has responded [16] to Plaintiff's Motion for Judgment on the Pleadings, and Plaintiff has not filed a reply.

The Commissioner found that Plaintiff was not disabled, as defined by the Social Security Act, despite his severe impairment of multiple sclerosis.  The ALJ determined that Plaintiff was capable of performing sedentary work, except that he should avoid heat.  Because the ALJ's decision is supported by substantial evidence and in accord with relevant legal standards, the Commissioner's decision should be affirmed and Plaintiff's Motion for Judgment on the Pleadings denied.

I. BACKGROUND

A. Procedural Background

Plaintiff is a thirty-four-year-old male and former boxer. On September 19, 2011, he filed a Title II application for a period of disability and disability insurance benefits, and on March 19, 2013, a Title XVI application for supplemental security income. Plaintiff alleged that he was disabled beginning June 1, 2011, due to multiple sclerosis, muscle stiffness, bladder infections, blurry vision, and memory changes. Plaintiff was twenty-nine years of age on the alleged disability onset date of June 1, 2011. He was diagnosed with multiple sclerosis in July 2011. Plaintiff last worked on December 31, 2009, and alleges that he stopped working because of lower extremity weakness. R. [9] at 130, 329. Plaintiff's last date insured for purposes of his Title II application was June 30, 2012.

Plaintiff's applications were denied initially and on reconsideration. Plaintiff timely filed a request for hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a video hearing on May 21, 2013. Plaintiff and a vocational expert witness ("VE") testified at the hearing. The ALJ issued a decision unfavorable to Plaintiff on June 13, 2013.

The ALJ utilized the five-step sequential evaluation process to find Plaintiff not disabled under the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2011, the alleged onset date. At step two, the ALJ found that Plaintiff had a severe impairment of multiple sclerosis, with no

2

more than minimal functional limitations established in conjunction with any other conditions. At step three, the ALJ determined that Plaintiff's impairment, individually or in combination, did not meet or equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

Next, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that he should avoid heat.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a cafeteria attendant, a job performed at the light level of exertion. Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

more than minimal functional limitations established in conjunction with any other conditions. At step three, the ALJ determined that Plaintiff's impairment, individually or in combination, did not meet or equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

Next, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that he should avoid heat.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a cafeteria attendant, a job performed at the light level of exertion. Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

At step five, based on the VE's testimony, the ALJ found that Plaintiff was capable of making a successful adjustment to sedentary work with the restriction that he avoid heat. R. [9] at 29. Representative occupations offered by the ALJ were telephone solicitor, switchboard operator, and answering service clerk, all sedentary positions where Plaintiff would not be exposed to heat. *Id.* at 30-31.

Plaintiff requested review of the ALJ's decision, stating that he disagreed with the decision "due to M.S. and taking Rebif and in bed majority of time. Also severe weakness of lower extremity." *Id.* at 19. Plaintiff submitted post-hearing evidence, an RFC evaluation completed on October 8, 2013, by treating neurologist, Derek Letort, M.D. *Id.* at 11-17.

On July 29, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's June 13, 2013, decision, thereby rendering the ALJ's decision as the final decision of the Commissioner. Having exhausted his administrative remedies, Plaintiff commenced the present action by Complaint filed October 1, 2014.

B. Plaintiff's Medical Treatment History

Plaintiff experienced weakness in his legs in January 2010 while working out at the gym, lifting weights and doing squats and lunges. *Id.* at 192. He sought treatment from Terry Smith, M.D., a spinal and neurological surgeon, on May 5, 2010, complaining that

> his left leg started to get weak with walking. He says it is a few hundred yards when it feels weak and will drag. He does not really have any pain. At first he felt a numbness in the left foot but this is better. Coastal Family Health Center gave him some steroids which helped temporarily.

4

He has had no problems with bowel or bladder.

*Id.*

Plaintiff's gait and strength was recorded as normal. *Id.* Dr. Smith examined Smith two more times, on October 5, 2010, and on October 13, 2010. On October 5, 2010, Dr. Smith noted that Plaintiff had a normal gait but ordered MRIs of Plaintiff's thoracic and lumbar spines due to clonus and hyper-reflexia in the lower extremities. *Id.* at 191. On October 13, 2010, Plaintiff reported discomfort in his back and left leg weakness, especially with stair walking. *Id.* at 188. Dr. Smith suspected either cervical stenosis or neuropathy. He ordered physical therapy and referred Plaintiff to neurologist Dr. Carrau at the Biloxi Neurology Clinic. *Id.* Dr. Smith stated that he would order an MRI of the cervical spine and other testing if Plaintiff did not improve. *Id.*

Plaintiff treated with Dr. Carrau from June 16, 2011, until October 3, 2011. After MRIs of Plaintiff's brain and cervical spine were obtained and other testing performed, Dr. Carrau provisionally diagnosed Plaintiff with multiple sclerosis in July 2011. *Id.* at 337. A second brain MRI on July 18, 2011, showed that the white matter disease was stable as compared to the previous MRI. *Id.* at 335-37. Dr. Carrau referred Plaintiff to neurologist Krisztina Martonmravik, M.D., at Oschner Medical Center, to confirm Plaintiff's multiple sclerosis diagnosis. On September 23, 2011, Dr. Martonmravik confirmed the diagnosis. *Id.* at 279-283. She recommended that Plaintiff start the immunomodulatory treatment Rebif. *Id.* at

280.

On November 17, 2011, the Office of Disability Determination Services sent disability report forms to Dr. Smith and Dr. Carrau, requesting treatment records and informing them that Plaintiff was alleging an inability to work due to multiple sclerosis, muscle stiffness, bladder infections, blurry vision, and memory changes. *Id.* at 187. Dr. Smith responded on November 23, 2011, writing: "He goes to my gym, and I see him frequently lifting weights. If he can lift weights at [the] gym, he can work. I have seen no objective evidence of disability." *Id.* Dr. Carrau answered on December 13, 2011, listing Plaintiffs diagnoses, prognosis, and duration as: "Multiple sclerosis. Guarded prognosis given that disease is progressive in lifetime." *Id.* at 310.

Plaintiff began treating with neurologist Derek Letort, M.D., at Biloxi Neurology Center, on February 29, 2012. Dr. Letort's treatment notes provide:

> Mr. Netter is a 29-year-old young man with a recent diagnosis of MS in July 2011. Since he was last seen about 3 months ago, he does not endorse any new symptoms of MS. In brief summary, the first attack he had was in June of 2011 with left leg lower extremity weakness and numbness. His leg gave out while he was buffing some floors. He also had a little bit of back pain. He presented to a 'back doctor' who referred him to Dr. Carrau and the work up ultimately yielded a diagnosis of MS. . . . He was started on Rebif and he is taking the medicine well. He does feel as if he has the flu when he gets it and he has been self-medicating with Motrin to prevent this. While he has not had any new attacks such as dysarthria or double vision in one eye or the other, he does continue to have problems from his first attack. He continues to have left lower extremity weakness, although it did improve with physical therapy. He also has numbness in his left lower extremity and

> difficulty controlling his bladder and his leg now feels stiff. Otherwise, he does not complain of a lot of neurologic symptoms. He does have urge [sic] incontinence in his bladder and he feels like he has poor energy. Otherwise he is without complaint.

*Id.* at 329.

A motor exam by Dr. Letort revealed strength at "5/5 globally with the exception of his left lower extremity which is 4/5." *Id.* at 330. Plaintiff "walk[ed] with a slightly spastic slightly seconducting gait in the left lower extremity." *Id.* Dr. Letort concluded:

> He continues to have problems from his first attack but so far has not had any additional attacks. . . . I would strongly consider that he continue Rebif and we will obtain an MRI scan later in the year to evaluate evolution of the lesions. As far as some of his other symptoms go, we will try a low does of Baclofen to see if it helps the spasticity in his leg and Oxybutynin for his urging continence and Amantadine for the poor energy.

*Id.* at 329.

On July 10, 2012, ten days after Plaintiff's last date insured for Title II disability insurance purposes, Plaintiff reported to Dr. Letort that he began having

> a little bit of pain in his left hand. . . . He is also having a little bit of pain in his left lower extremity that's on the medial knee with some fatigue in his left leg as he walks. It will become weaker than his right. He hasn't had any falls, but has had a couple of near misses. He was participating in physical therapy earlier in the year, but he has been discharged with that and he is continuing to do his exercises at home. Otherwise, he does not have any additional complaints.
> . . .
>
> Since he was last seen, he is doing largely the same. He

> continues to have problems with his left lower extremity. I do not believe that this represents actual worsening of his multiple sclerosis, but may be related to a previous attack. For the next step, I would recommend getting his yearly MRI to evaluate the possibility that his multiple sclerosis could be worsening. If not, we may need to reconsult physical therapy for additional recommendations and also to ensure that he is performing the proper exercises at home.

*Id.* at 328.

Plaintiff was not insured and was unable to obtain another MRI. Upon his return to Dr. Letort on September 10, 2012, Plaintiff reported "doing quite a bit worse." *Id.* at 326. He was noted by Dr. Letort to be "currently waiting for disability." *Id.* Dr. Letort's treatment records provide:

> The weakness in his leg has progressed to the point where he cannot stand independently on it. He uses a cane to walk and has begun using a shower chair. His headaches and body aches are continuing to get worse. . . . He has no loss of vision, but his right eye is still twitching and sometimes will go back to his ear. . . . He is becoming a little more forgetful.
>
> . . .
>
> Since he was last seen, his weakness in his leg has gotten worse and is his main complaint. He possibly had another multiple sclerosis attack last month or possibly it could be related to heat given that August is the hottest month of the year. . . . For the next step, we are going to refer him to physical therapy to begin strengthening of his leg. We are also going to start Ampyra 10 mg BID to try to improve his speed of walking.

*Id.*

On September 13, 2012, Dr. Letort wrote a "to whom it may concern letter," stating that as a result of multiple sclerosis, Plaintiff

8

> has begun to experience problems with his gait causing him to depend on a cane to help control his balance. He has undergone physical therapy and continues on his MS medication regimen. He also has to follow up with Urology to monitor kidney and bladder function. He is advised to sustain from getting too hot which can lead to MS attacks. We are attempting to get him back in physical therapy to help strengthening his legs. At this time, I do not feel that Mr. Netter is physically able to work due to his progression of weakness.

*Id.* at 313.

Dr. Letort examined Plaintiff again on October 19, 2012. Plaintiff was "doing about the same" and because of no insurance, "has not been able to get the physical therapy or the Ampyra that we recommended to help him walk better." *Id.* at 324. The treatment notes state: "He walks with a limp needing a cane to ambulate." *Id.*

When Plaintiff returned to Dr. Letort on December 11, 2012, he reported that the weakness in his leg had improved, and he no longer had urinary urgency. *Id.* at 322. Plaintiff had "a little bit of memory loss" and "a little bit of burning pain in his lower extremities" but "otherwise does not have any other problems. He has no further complaints." *Id.* A motor exam showed 5/5 strength in the bilateral lower extremities, 4/5 in the left lower extremity, and 5/5 in the right lower extremity. *Id.* at 323. It was noted that "[h]e requires a cane to ambulate." *Id.* Plaintiff's speech, language, memory, knowledge, and affect were normal. *Id.* at 322. His neurological exam was within normal limits. *Id.* Dr. Letort concluded that Plaintiff was doing reasonably well. *Id.* at 323.

II. DISCUSSION

A. Standard of Review

A review of the Commissioner's denial of benefits is limited to two inquiries: (1) whether the decision is supported by substantial evidence in the record as a whole, and (2) whether the Commissioner applied the correct legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence must be more than a mere scintilla, but it need not be a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

The Court's role is to scrutinize the entire record to ascertain whether substantial evidence supports the Commissioner's findings. *Hollis v. Bowen,* 837 F.2d 1378, 1383 (5th Cir. 1988). The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner. *Id.* This is so, even if the Court determines that the evidence could allow for a different finding. *Strickland v. Harris,* 615 F.2d 1103, 1106 (5th Cir. 1980). A finding of no substantial evidence is appropriate only if there is "a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen,* 864 F.2d 340, 343-44 (5th Cir. 1988).

As summarized by the United States Court of Appeals for the Fifth Circuit,

> [t]he claimant has the burden of proving she has a medically determinable physical or mental impairment lasting at least twelve months that prevents her from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1572(a) and (b). The ALJ uses a five-step sequential process to evaluate claims of disability

> and decides whether: (1) the claimant is not working in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's impairment meets or equals a listed impairment in Appendix 1 of the Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other work. 20 C.F.R. § 404.1520.
>
> The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner for the fifth step. Thus, the claimant must show first that she is no longer capable of performing her past relevant work. 20 C.F.R. § 404.1520(e). If the claimant satisfies this burden, then the Commissioner must show that the claimant is capable of engaging in some type of alternative work that exists in the national economy. *See Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987). Once the Commissioner makes this showing, the burden of proof shifts back to the claimant to rebut this finding. *Id.*

*Newton v. Apfel*, 209 F.3d 448, 452–53 (5th Cir. 2000).

B.  Analysis of Plaintiff's Alleged Errors

Plaintiff argues that the ALJ erred by improperly discounting the opinion of Dr. Letort that Plaintiff was physically unable to work, by attacking Plaintiff's credibility, and by not incorporating fatigue, weakness, and the side effects of the medication Rebif into the RFC hypothetical presented to the VE.

1.  The Weight Accorded to the Medical Evidence

The ALJ gave significant weight to Dr. Smith's opinion that Plaintiff was capable of working but did not credit Dr. Letort's opinion that Plaintiff was not. Dr. Smith treated Plaintiff in 2010 before he was diagnosed with multiple sclerosis and completed a DDS report form on November 23, 2011, stating: "[Plaintiff] goes to my gym, and I see him frequently lifting weights. If he can lift weights at [the] gym, he

can work. I have seen no objective evidence of disability." R. [9] at 187. Dr. Letort most recently treated Plaintiff and stated in a September 13, 2012, "to whom it may concern" letter: "As a result of Mr. Netter's condition, he has begun to experience problems with his gait causing him to depend on a cane to help control his balance. . . . At this time I do not feel that Mr. Netter is physically able to work due to his progression of weakness." *Id.* at 313.

The ALJ found that Dr. Letort's opinion that Plaintiff could not work was inconsistent with the overall evidence and there was "no support shown in the objective findings demonstrating a need for the use of a cane." *Id.* at 29. The ALJ did, however, credit Dr. Letort's findings that Plaintiff experienced lower extremity weakness and should avoid heat because it can lead to multiple sclerosis attacks. The ALJ took both factors into account when he found that Plaintiff could not perform the light exertion work he had done in the past but he could adjust to sedentary work, except that he should avoid heat.

Plaintiff argues that Dr. Smith's opinion should not have been given significant weight because Dr. Smith is not a treating source. Plaintiff maintains that Dr. Smith should not be viewed as a treating source because he treated Plaintiff in 2010, before Plaintiff was diagnosed with multiple sclerosis, and before the alleged disability onset date of June 1, 2011. Plaintiff asserts that Dr. Smith is not a treating source because he did not know that Plaintiff had been diagnosed with multiple sclerosis when he stated his opinion that Plaintiff was not disabled. This argument ignores that fact that Dr. Smith wrote his opinion on a DDS

disability report form that informed him that Plaintiff was alleging an inability to work due to multiple sclerosis, muscle stiffness, bladder infections, blurry vision, and memory changes. *Id.* at 187.

Plaintiff cites only the definition of "treating source" as support for his position that Dr. Smith not be viewed as a treating source. Pl.'s Mem. [15] at 9.

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

20 C.F.R. § 404.1502

Plaintiff chose Dr. Smith as a physician. Dr. Smith provided Plaintiff with medical treatment and evaluation on three occasions in 2010 when Plaintiff first began experiencing symptoms of multiple sclerosis. Dr. Smith noted potential neuropathy and referred Plaintiff to neurologist Dr. Caddau. Plaintiff has not cited the Court to any case law or sufficiently persuasive legal authority which supports the proposition that Dr. Smith, a spinal and neurological surgeon who examined and treated Plaintiff regarding his lower extremity weakness, should not be considered a treating source. Though the ALJ erred by referring to Dr. Smith as a neurologist, when he is in fact a spinal and neurological surgeon, this error is harmless because clearly Dr. Smith was qualified to treat Plaintiff. The error does

not prejudice Plaintiff's substantive rights.

Regardless, the ALJ was plain that his decision would be supported, even if Dr. Smith's opinion and information were ignored. The ALJ stated in his decision that "[e]ven without considering this information and opinion [from Dr. Smith], the evidence does not demonstrate limitations that exceed the residual functional capacity herein and that would preclude the claimant from performing sedentary work." R. [9] at 29. The ALJ referenced the evidence from other treating sources that supported his finding that Plaintiff's multiple sclerosis did not prevent Plaintiff from being capable of sedentary work, except that he should avoid heat. *Id.* at 27-29.

- Dr. Carrau's treatment notes indicate that in June 2011, Plaintiff had 5/5 strength in his lower extremities and was able to stand up with his arms crossed to his chest without assistance. *Id.* at 341. Comparing the MRI of Plaintiff's brain from June 20, 2011, to July 18, 2011, Dr. Carrau concluded that the white matter disease was stable. *Id.* at 335.

- Dr. Martonmravik's treatment notes of September 23, 2011, provide: "Normal gait and stance. Can tandem. Unable to hop on left foot but able on the right foot. Can squat all the way down." *Id.* at 279. Plaintiff's motor strength was "5/5 strength throughout bilateral upper and lower extremities in all groups except there is weakness in the left lower extremity, proximally, 3+/5. Muscle tone is normal in the upper and lower extremities. No atrophy or fasciculations." *Id.* at 280.

- Plaintiff participated in around seven physical therapy sessions from September 6, 2011, until September 27, 2011. The therapist's notes provided that "Mr. Netter has made great progress. He has met all goals and has achieved a normal gait pattern." *Id.* at 287. The therapist recorded that Plaintiff had progressed rapidly. *Id.* Plaintiff was noted to be "able to AMB *1000 feet [with] a normal pattern [and] no foot dragging. The

> patient demonstrated a consistent speed [and] good endurance (indoors [and] outdoors, on varying surfaces). . . . Able to pick-up object off floor [and] balance deficits." *Id.* at 288.

- Dr. Carrau referred Plaintiff to Coastal Family Health Center for laboratory testing and routine medical examination. The treatment records from Coastal Family Health Clinic consistently document a normal gait. *Id.* at 314-320.

- Dr. Letort's treatment notes of September and October of 2012, and his "to whom it may concern" letter of September 2012 indicate that Plaintiff was "doing much worse from weakness of his lower extremity" and could not stand independently on his leg. *Id.* at 313, 324-26. By the time Plaintiff returned to Dr. Letort on December 11, 2012, Plaintiff reported that the weakness in his leg had improved, and he no longer had urinary urgency. *Id.* at 322. Plaintiff had "a little bit of memory loss" and "a little bit of burning pain in his lower extremities" but "otherwise does not have any other problems. He has no further complaints" *Id.* His speech, language, memory, knowledge, and affect were normal. His neurological exam was within normal limits. It was determined that Plaintiff was doing reasonably well. While a notation stated that Plaintiff required a cane to ambulate, "there were no finding demonstrating the need for the cane." R. at 29.

The ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions accordingly." *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir. 1985). The ALJ reviewed the record evidence and concluded that Dr. Smith's opinion that Plaintiff showed no objective evidence of disability was more consistent with the overall evidence than Dr. Letort's opinion that Plaintiff was not able to work. The ALJ was allowed to discount Dr. Letort's opinion because Dr. Letort's opinion that Plaintiff was functionally unable to do any work was not fully supported by clinical laboratory and diagnostic tests, and it was not fully consistent with the opinions and findings from other treating sources.

The ALJ properly performed his function as the trier of fact and in accord with Social Security regulations governing the evaluation of medical opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ relied on specific testimony from a VE who opined that there are available jobs in the national economy for a person closely similar to Plaintiff in age, education, work history, and RFC. The VE's specialized knowledge of work requirements was not challenged by Plaintiff. Dr. Letort's treatment records and "to whom it may concern" letter do not indicate that Dr. Letort's opinion of disability was based upon similarly competent vocational evidence. Even Dr. Letort, in the RFC form he completed on October 8, 2013, after the ALJ hearing, answered "unknown" when asked if there was "other work the patient could do given his or her skills and disability or impairment." R. [9] at 16. "[T]he ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan,* 919 F.2d 901, 905 (5th Cir. 1990).

The ALJ did not, as Plaintiff alleges, "ignore[ ] the known facts about the natural progression of multiple sclerosis, an incurable disease." Pl.'s Mem. [15] at 10. Instead, the ALJ found that, during the relevant time period, Plaintiff's symptoms had not worsened to a point that precluded Plaintiff from working at the sedentary level of exertion, with the restriction that he avoid heat. R. [9] at 27. The evidence cited by the ALJ in support of his decision easily exceeds "more than a mere scintilla" of evidence. The ALJ's findings of fact which are supported by substantial evidence are conclusive. *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir. 1995). The Court may not reweigh the evidence or substitute its judgment for that

of the Commissioner, even if the evidence could allow for a different finding. *Hollis,* 837 F.2d at 1383; *Strickland,* 615 F.2d at 1106.

2.  Plaintiff's Credibility

The ALJ also considered Plaintiff's credibility before reaching the conclusion that Plaintiff was not disabled. The ALJ found Plaintiff "to be less than credible because his allegations of the intensity, persistence and limiting effects of these symptoms is not supported by objective findings." R. [9] at 27.

Plaintiff alleged that he discontinued physical therapy "because his condition started getting worse." *Id.* at 62. The ALJ found that this allegation undermined Plaintiff's credibility because the physical therapy treatment records were clear that Plaintiff was discharged after he progressed rapidly, met all goals, and attained a normal gait. *Id.* at 287-306.

The ALJ discounted Plaintiff's claim that he discontinued working out at the gym in 2010. Plaintiff's testimony on this point was inconsistent. Plaintiff testified that he stopped working out at the gym in 2010, but he also testified that he stopped working out when he was diagnosed with multiple sclerosis, which was in July 2011. *Id.* at 70. Plaintiff testified that it was Dr. Martonmravik who told him that he should not box anymore. *Id.* at 72. Dr. Martonmravik's records note that a discussion regarding "avoiding strenuous exercise" was had on September 23, 2011, not in 2010. *Id.* at 280. Plaintiff's discussion with Dr. Martonmravik occurred a month before Dr. Smith wrote his note of November 23, 2011, informing DDS that

17

he frequently saw Plaintiff lifting weights at the gym.

When the ALJ questioned Plaintiff regarding why a diagnosis would immediately result in an inability to work out at the gym, Plaintiff stated that he was "still able to do the stuff" after he was diagnosed, but his condition then worsened to the point where he could not. *Id.* at 71. Plaintiff claims that by September 10, 2012, he could not stand independent of a cane. *Id.* at 326. Plaintiff testified that he could not wash dishes, vacuum, or stand to make a sandwich. *Id.* at 76. The ALJ was not persuaded that Plaintiff was being fully truthful because his allegation of totally incapacitating symptoms was not consistent with the record evidence as a whole.

The ALJ compared Plaintiff's testimony to the record evidence and gave specific reasons for finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of condition were not entirely credible. Social Security Ruling (SSR) 96-7p, 1996 WL 374186 (July 2, 1996). The ALJ's credibility determination is thus supported by substantial evidence and is conclusive. *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001)(citations omitted).

2. <u>The RFC Determination</u>

Plaintiff alleges that the ALJ erred in his RFC analysis by failing to take into account Plaintiff's fatigue, general muscle weakness, and the flu-like side effects of Rebif, Plaintiff's immunomodulatory treatment. Pl.'s Mem. [15] at 14. Plaintiff testified that he would not be able to maintain a five-day workday, eight hours a day, because of the medicine Rebif that he injects subcutaneously on Mondays,

Wednesdays, and Fridays at 10 p.m. at night. R. [9] at 77. Plaintiff stated that the injections gave him body aches, chills, and headaches that lasted "at least an hour." *Id.* at 76. Plaintiff testified that he experienced side effects "the very next day" after the injections and would not be able to make it to work on those days. *Id.* at 77.

The ALJ was not required to accept Plaintiff's testimony that the side effects of Rebif were so severe that it prevented Plaintiff from working. The only medical evidence Plaintiff relies on regarding the side effects of Rebif is a treatment note from Dr. Letort, stating: "He was started on Rebif and is taking the medicine well. He does feel as if he has the flu when he gets it and he has been self-medicating with Motrin to prevent this." *Id.* at 329. This note indicates that Plaintiff was able to manage the side effects of Rebif with Motrin. It is inconsistent with Plaintiff's allegation of disabling side effects.

The ALJ concluded that the medical evidence regarding fatigue, general muscle weakness, and the flu-like side effects of Plaintiff's immunomodulatory treatment was unremarkable and did not corroborate the extent of restriction alleged by Plaintiff. Given that the ALJ posed hypotheticals to the VE that reasonably incorporated the restrictions that the ALJ recognized, the ALJ properly relied on the VE's testimony to deny Plaintiff's claim. *Bowling v. Shalala,* 36 F.3d 431, 434 (5th Cir. 1994).

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Plaintiff's Motion for Judgment on the Pleadings [14] is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Commissioner of Social Security's decision is **AFFIRMED**.

**SO ORDERED AND ADJUDGED**, this the 14th day of March, 2016.

/s/ *John C. Gargiulo*
JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE